COMMONWEALTH vs. ANGELO JACKSON

Suffolk. February 3, 1976. — March 15, 1976.

Present: HENNESSEY, C.J., REARDON, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Firearms. Public Welfare Offense. Constitutional Law,* Cruel and unusual punishment, Due process of law, Separation of powers, Judiciary. *Practice, Criminal,* Probation, Sentence.

A mandatory minimum sentence of one year for carrying a firearm without a license, as provided by G. L. c. 269, § 10 (a), is not so disproportionate to the offense as to constitute cruel and unusual punishment. [909-916]

General Laws c. 269, § 10 (a), interpreted by this court as requiring as a necessary element of the offense proof that the accused knew

---

that he was carrying a firearm, although not requiring knowledge of the accused as to the unregistered status of the firearm, does not violate the due process of law provisions of the State and Federal Constitutions. [916-917]

The standard of review in considering the constitutionality of a mandatory minimum sentence of one year for carrying a firearm without a license under G. L. c. 269, § 10 (a), is whether the statute bears a reasonable relation to a permissible legislative objective, and applying this standard, this court concluded that c. 269, § 10 (a), is a valid exercise of the Legislature's authority. [917-920]

The ability to defer the imposition of a sentence is not an inherent power of the judiciary beyond statutory limitation, and, therefore, G. L. c. 269, § 10 (a), which requires a mandatory minimum sentence of one year, does not infringe on judicial discretion in violation of the separation of powers doctrine embodied in art. 30 of the Massachusetts Declaration of Rights. [920-925]

COMPLAINT received and sworn to in the Municipal Court for the Roxbury District on July 7, 1975.

On appeal to the Superior Court, the case was heard by *Robert Sullivan*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Clyde D. Bergstresser (Lawrence D. Shubow* with him) for the defendant.

*Richard A. Voke*, Assistant District Attorney (*George E. Foote, Jr.*, with him) for the Commonwealth.

*J. John Fox*, pro se, amicus curiae, submitted a brief.

*Jeanne Baker, Richard Neumeier, Harvey Silverglate, & John Reinstein*, for Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

HENNESSEY, C.J.   The defendant was convicted of carrying a pistol without a license and received the mandatory minimum sentence of one year in a house of correction as provided by G. L. c. 269, § 10 (a), set forth below.[1]   On appeal, he challenges the constitutionality of

---

[1] General Laws c. 269, § 10, as amended by St. 1975, c. 113, § 2, provides in part:

"(a) Whoever, except as provided by law, carries on his person, or

this statute on the grounds that a mandatory one-year jail sentence on conviction constitutes cruel and unusual punishment, denies him due process of law and violates the separation of powers doctrine embodied in art. 30 of the Declaration of Rights of the Massachusetts Constitution.

carries on his person or under his control in a vehicle, a firearm, loaded or unloaded, as defined in section one hundred and twenty-one of chapter one hundred and forty without either:

"(1) having in effect a license to carry firearms issued under section one hundred and thirty-one of chapter one hundred and forty; or

"(2) having in effect a license to carry firearms issued under section one hundred and thirty-one F of chapter one hundred and forty; or

"(3) complying with the provisions of section one hundred and twenty-nine C and one hundred and thirty-one G of chapter one hundred and forty; or

"(4) having complied as to possession of an air rifle or BB gun with the requirements imposed by section twelve B of chapter two hundred and sixty-nine;

"and whoever carries on his person, or carries on his person or under his control in a vehicle a rifle or shotgun, loaded or unloaded, without either:

"(1) having in effect a license to carry firearms issued under section one hundred and thirty-one of chapter one hundred and forty; or

"(2) having in effect a license to carry firearms issued under section one hundred and thirty-one F of chapter one hundred and forty; or

"(3) having in effect a firearm identification card issued under section one hundred and twenty-nine B of chapter one hundred and forty; . . .

. . . .

. . . .

"shall be punished by imprisonment in the state prison for not less than two and one-half nor more than five years, or for not less than one year nor more than two and one-half years in a jail or house of correction. The sentence imposed upon such person shall not be reduced to less than one year, nor suspended, nor shall any person convicted under this subsection (*a*) be eligible for probation, parole, or furlough or receive any deduction from his sentence for good conduct until he shall have served one year of such sentence. Prosecutions commenced under this section shall neither be continued without a finding nor placed on file. . . ."

We conclude that the § 10 (a) mandatory minimum sentence of one-year imprisonment does not constitute an unconstitutional exercise of legislative power, and accordingly we affirm the judgment below.

The defendant, having been convicted and sentenced by a District Court judge, entered an appeal in the Superior Court in Suffolk County. A motion to dismiss challenging the statute's constitutionality was denied by a Superior Court judge. On the basis of a statement of agreed facts warranting a finding of guilt, the defendant was convicted and sentenced to one year in a house of correction, execution of which was stayed pending appeal.

The statement of agreed facts, which was adopted as findings of fact by the trial judge, indicates that on the evening of July 5, 1975, the defendant and another male were observed by two police officers. Seeing the officers, the defendant's companion dropped a bag containing a revolver. The defendant attempted to flee, but was apprehended by an officer who found a second gun, a .25 caliber pistol, in the defendant's possession. In response to questioning by police, the defendant admitted that he had neither a license to carry the gun nor an identification card.

Prior to amendment in 1974, G. L. c. 269, § 10, provided that a defendant who was convicted for the first time of carrying a firearm without a license could be sentenced to not less than six months in jail and not more than five years in State prison, but if he had not been previously convicted of a felony, a fine of not more than $50 or imprisonment not exceeding two and one-half years could be imposed. This provision was struck by St. 1974, c. 649, § 2, and inserted in its place was § 10 (a) which establishes a one to five-year sentence, the one-year jail sentence being a mandatory minimum. The sentencing judge is precluded from placing a defendant on probation, suspending the sentence, filing the case or con-

tinuing it without a finding, and a defendant is ineligible for parole, furlough or good conduct deductions.[2]

In upholding this statute, we do not pass on the wisdom of the Legislature's acts. Although we recognize that the defendant advances many arguments that raise serious doubts as to the efficacy of this statute, we must limit our discussion to those that relate to its constitutionality, for our function is to determine whether the act before us complies with constitutional mandates. We do not, for instance, address the defendant's argument that the effect of § 10 (a) will be to take sentencing discretion away from the judge and to place it, instead, in the hands of the police, thereby making the criminal process less visible, and perhaps more arbitrary. Nor should we engage in the on-going debate concerning the effectiveness of substituting mandatory sentences for flexible sentencing and of emphasizing deterrence over rehabilitation. Neither may we concern ourselves with the potential unfairness of a statutory scheme that permits judges to impose probations and suspended sentences in cases of serious (even violent) crimes, and yet requires incarceration of one convicted under the instant statute. Although it is argued that a system of justice that does not provide the necessary flexibility will ill serve the needs of our citizens, such a policy argument is not properly before us, but rather should be addressed to the Legislature.[3]

---

[2] Although G. L. c. 269, § 10, was further amended by St. 1975, c. 4, which postponed the effective date of the statute from January 1, 1975, to April 1, 1975, and by St. 1975, c. 113, § 2, see note 1 *supra*, the penalties for unlawful carrying of a firearm were left intact.

[3] We also add that the case before us raises only the issue of whether § 10 (a) is a constitutional exercise of legislative authority; there is no claim that the defendant's conduct does not fall within the proscription of the statute. We are not called on at this time to interpret, for example, the extensive and complex list of exemptions set forth in c. 140, § 129C. Although there will no doubt be instances where a person found carrying a firearm without a license cannot be convicted

It follows that the questions that we decide today concern only the statute's constitutionality, namely, whether this enactment constitutes cruel and unusual punishment or denies due process in contravention of the United States and Massachusetts Constitutions or violates art. 30 of our Declaration of Rights. We turn now to those questions.

1. The defendant contends that § 10 (*a*), by imposing a mandatory minimum one-year sentence, prescribes punishment so disproportionate to the offense as to constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, and art. 26, the parallel provision of our Declaration of Rights. Although we acknowledge that this statute imposes severe and inflexible penalties, it is not cruel and unusual in a constitutional sense.

We note at the outset that the Legislature has great latitude to determine what conduct should be regarded as criminal and to prescribe penalties to vindicate the legitimate interests of society. *Commonwealth* v. *Morrow,* 363 Mass. 601, 610-611 (1973). *McDonald* v. *Commonwealth,* 173 Mass. 322, 328 (1899). "The function of the legislature is primary, its exercises fortified by presumptions of right and legality, and is not to be interfered with lightly, nor by any judicial conception of their wisdom or propriety." *Weems* v. *United States,* 217 U.S. 349, 379 (1910). It is thus with restraint that we exercise our power of review to determine whether the punishment before us exceeds the constitutional limitations imposed by the Eighth Amendment and by art. 26.

This court has recognized that "it is possible that imprisonment in the state prison for a long term of years might be so disproportionate to the offence as to constitute a cruel and unusual punishment." *McDonald* v. *Com-*

under § 10 (*a*), it would be inappropriate at this time to try to anticipate those situations, but rather we must reserve decision until such time as the proper case is before us.

*monwealth, supra* at 328. This same principle was echoed by the United States Supreme Court in *Weems* when it stated that it is "a precept of justice that punishment for crime should be graduated and proportioned to offense." 217 U.S. at 367. Although punishment may be cruel and unusual not only in manner but length, "a heavy burden is on the sentenced defendant to establish that the punishment is disproportionate to the offense for which he was convicted." *Commonwealth* v. *O'Neal, ante,* 242, 248 (1975) (*O'Neal II*) (Tauro, C.J., concurring). It must be so disproportionate to the crime that "it shocks the conscience and offends fundamental notions of human dignity." *In re Lynch,* 8 Cal. 3d 410, 424 (1972).

Courts, in an effort to avoid a subjective approach, have developed guidelines to determine whether punishment is constitutionally disproportionate. See, e.g., *Weems* v. *United States, supra; In re Foss,* 10 Cal. 3d 910 (1974); *In re Lynch, supra; People* v. *Broadie,* 37 N.Y.2d 100 (1975). The tripartite analysis, set forth explicitly by the California Supreme Court in *In re Lynch, supra* at 425-427, serves as a useful tool.

The first prong of the disproportionality test considers the nature of the offense and the offender in light of the degree of harm to society. The penological purposes of the prescribed punishment are also relevant to this analysis, see *In re Foss, supra* at 919-920; *People* v. *Broadie, supra* at 114, for, as stated by Mr. Justice Brennan in his concurrence in *Trop* v. *Dulles,* 356 U.S. 86, 111 (1958), "Clearly the severity of the penalty, in the case of a serious offense, is not enough to invalidate it where the nature of the penalty is rationally directed to achieve the legitimate ends of punishment."

It is clear that § 10 (*a*) inhibits consideration of the threat posed by the offender to society, for a judge may not take into account mitigating circumstances or the offender's past history. Although this inflexible approach, which limits a court's ability to graduate the punishment

to the offender, is open to criticism, this is not sufficient to permit us to invalidate the present statute in view of the harm to society sought to be minimized by this legislative enactment.

At a time when we face a frightening rise in crime, our Legislature must be able to experiment in finding solutions to this pervasive problem. One such attempt, § 10 (a), seeks to control the carrying of firearms so as to "protect the public from the potential danger incident to . . . [their] unlawful possession . . . ." *Commonwealth* v. *Bartholomew*, 326 Mass. 218, 219 (1950). There is no question that firearms play a significant role in crime. In 1974 firearms were used in 68% of the homicides (handguns accounted for 54% of the homicides) and 25% of the serious assaults in this country. F.B.I. Uniform Crime Reports for 1974, at 15, 20. In the Northeast in that same year, a handgun was used in 34% of all robberies. *Id.* at 26. Some statistics further indicate that, when a gun is used in an attack, the chances of death are about five times as great as when a knife is used, and, as the number of homicides resulting from the use of firearms has increased in recent years, the number of all homicides has also increased. G. Newton & F. Zimring, Firearms and Violence in American Life (Staff Report submitted to the National Commission on the Causes and Prevention of Violence) at 44-45, 48. There is also some evidence from which the Legislature could conclude that the use of guns in violent crime rises and falls with gun ownership, and, as a consequence, that firearm control laws, such as exist in Massachusetts (see G. L. c. 140, § 131) that substantially reduce total gun ownership by restrictive licensing also reduce the use of guns in violence. *Id.* at 77-78, 127-128. But see Benenson, A Controlled Look at Gun Controls, 14 N.Y.L.F. 718 (1968). In addition, the Legislature might infer from common knowledge, as well as from the scant available data, that a large proportion of those who use guns in violent crimes in this Commonwealth are unlicensed. See Newton & Zimring, *supra* at 51-53. Concededly, there is serious

dispute as to the conclusions that should be drawn from evidence relating to gun control. Nevertheless, in light of the rational inferences which the Legislature might reach, we cannot say that a one-year mandatory minimum is so disproportionate to the magnitude of the crime as to render the statute unconstitutional.

When determining disproportionality, we must further consider the penological purposes for the enactment of a mandatory minimum sentence. As recognized by the Supreme Court in *Pennsylvania ex. rel. Sullivan* v. *Ashe,* 302 U.S. 51, 55 (1937), the Legislature "may inflict a deserved penalty merely to vindicate the law or to deter or to reform the offender or for all of these purposes." The present statute is obviously an attempt to deter through a nondiscretionary penalty. In this regard, there is increasing support for the proposition that certainty of punishment has a significant deterrent effect on crime rates. See, e.g., J.Q. Wilson, Thinking About Crime 174-175 (1975); Antunes & Hunt, The Deterrent Impact of Criminal Sanctions: Some Implications for Criminal Justice Policy 51 J. of Urban Law 145 (1973). See also *Furman* v. *Georgia,* 408 U.S. 238. 302 (1972) (Brennan, J., concurring); *id.* at 312-313 (White, J., concurring); *O'Neal II, ante,* 242, 258 n.16 (1975) (Tauro, C.J., concurring); *id.* at 278 n.3 (Wilkins, J., concurring). Thus, the Legislature could reasonably decide that a mandatory jail sentence, which removes many of the opportunities for the exercise of discretion and leniency, would be likely to serve as an effective deterrent.

It also may be that the Legislature, aware of the ineffectiveness of less severe punishments and past efforts to rehabilitate, thought it necessary to impose a more harsh, inflexible sentence than had previously existed in order to curb the rising incidence of unlawful possession of firearms and to reduce the high rate of recidivism. It was reported that the number of arrests for weapons violations, including the carrying of unlicensed firearms, had increased in this country by 43% during the period

from 1969 to 1974. F.B.I. Uniform Crime Reports for 1974, at 183. In addition, there is evidence to indicate that penalties less severe than those now provided for in Massachusetts have failed to deter offenders from committing the same crime or other violent crimes. *Id.* at 49-51. For instance, "[o]f the 3,203 offenders being released in 1972, from a weapons violation, 11 percent were rearrested for a violent crime within three years." *Id.* at 47. Although there is serious debate as to the effectiveness of harsh penalties in reducing crime, see, e.g., J.Q. Wilson, *supra* at 174-175; F. Zimring & G. Hawkins, Deterrence (1973), we cannot say that the Legislature has exceeded its prerogative in determining that a mandatory minimum sentence would serve to deter more effectively than a less severe penalty. See *Furman v. Georgia, supra* at 280-281 (Brennan, J., concurring).

The second and third prongs of the disproportionality analysis proposed in *Lynch* involve a comparison of the challenged punishment with other punishments imposed within the State, as well as with punishments imposed for the same or similar crimes in other jurisdictions. 8 Cal. 3d at 426-427.

We are aware of no other State that subjects a first offender to a mandatory sentence for the carrying of a firearm without a license, but we note that other jurisdictions have enacted legislation that provides for a maximum penalty that is equal to if not more severe than the five-year prison term set forth in G. L. c. 269, § 10 (*a*). See, e.g., Iowa (Iowa Code Ann. §§ 695.2-695.3 [1950] [Supp. 1975] — a fine of not more than $1,000 or not more than five years' imprisonment for the unlawful carrying of a concealed weapon); Michigan (Mich. Compiled Laws Ann. § 750.227 [1968] — not more than five years or a fine of not more than $2,500 for the unlawful carrying of a concealed weapon); New Jersey (N.J. Stat. Ann. 2A:85-6, 2A:151-46 [1969] — a fine of up to $2,000 or imprisonment for up to seven years for the unlawful possession of a firearm); Pennsylvania (18 Pa. Stat. Ann.

§§ 1104, 6106, 6119 [1973] — not more than five years for the carrying of a firearm without a license); Rhode Island (G. L. § 11-47-8 [1970] [Supp. 1975] — not less than one nor more than five years for the unlawful carrying of a pistol by a first offender). See also Newton & Zimring, *supra* at 202-240. Under the National Firearms Act, 26 U.S.C. §§ 5801-5872 (1970), Congress has established a penalty of not more than $10,000 or ten years in prison for the possession of a firearm not registered in accordance with the act. 26 U.S.C. §§ 5861(d), 5871 (1970). In addition, Rhode Island eliminates the possibility of deferment of sentence, probation, or the suspension of sentence if a defendant has been convicted previously of the unlawful carrying of a pistol.[4]  G. L. § 11-47-8, *supra.*  We do not believe that the disparity between this State and others is so compelling as to indicate "more than different exercises of legislative judgment . . . a difference between unrestrained power and that which is exercised under the spirit of constitutional limitations formed to establish justice." *Weems* v. *United States,* 217 U.S. 349, 381 (1910).[5]

---

[4] General Laws c. 269, § 10 (*d*), as amended by St. 1974, c. 649, § 2, imposes a sentence of not less than five years nor more than seven for a second offender, seven to ten years for a third offender and ten to fifteen years for a fourth offender and provides that the sentence shall not be suspended, nor shall the defendant be eligible for probation or good conduct deduction. Prior to this amendment in 1974, G. L. c. 269, § 10, contained similar penalties for recidivists.

[5] We note that harsh, mandatory penalties have been upheld consistently in the face of an Eighth Amendment challenge. See, e.g., *United States* v. *Beverley,* 416 F.2d 263 (9th Cir. 1969) (twenty-five-year mandatory sentence for aggravated mail robbery); *Gallego* v. *United States,* 276 F.2d 914 (9th Cir. 1960) (five-year minimum sentence for the unlawful importation of marihuana by a first offender with no probation, suspension or parole allowed); *United States ex rel. England* v. *Anderson,* 347 F. Supp. 115 (D. Del. 1972) (mandatory minimum sentence of five years for the possession of a firearm during the commission of a felony); *People* v. *Broadie,* 37 N.Y.2d 100 (1975) (mandatory maximum term of life imprisonment and minimums from one or six years to eight and one-third years for the sale of narcotics).

Compared to punishments for other crimes in the Commonwealth, the § 10 (a) penalty in some instances may be more severe,[6] for an offender could be incarcerated for a longer period of time than one sentenced for a violent crime involving harm to person or property, although the latter carries a longer potential sentence. Also, some offenders, because of the exercise of discretion by a sentencing judge, may serve no time in jail for an offense considered to be more harmful to society. But "leniency in one case does not transform a reasonable punishment in another case to a cruel one." *Howard* v. *Fleming,* 191 U.S. 126, 136 (1903). Moreover, the Legislature is free to determine the relative seriousness of different crimes and the relative need for deterrence. *United States* v. *Beverley, supra* at 265. See *Commonwealth* v. *Leis,* 355 Mass. 189, 198 (1969). The Legislature could reasonably, in light of the extensive use of guns in violent crimes, single out this offense for a mandatory sentence so as to avert the probability of serious violence attendant on the unlawful carrying of a firearm. Although we may question the wisdom of the decision to reject the traditional notions of individualizing the sentence to the offender and rehabilitating the convicted, we cannot say that it is without justification, for it can be argued that a statute designed only to deter, as opposed to most penal statutes which combine the goals of both rehabilitation and deterrence, must be inflexible and exceptionally harsh so as to be effective. Cf. *People* v. *Broadie,* 37 N.Y.2d 100 (1975). While we recognize that a penalty designed solely or primarily to deter may be so excessive in comparison to other punishments for more serious crimes as to constitute cruel and unusual punishment, a mandatory

---

[6] Although not more severe than § 10 (a), G. L. c. 271, § 10, provides that a person twice convicted of certain gambling offenses, which are crimes against the public welfare as is the unlawful carrying of a firearm, is subjected to three months to one year in jail with no possibility of a suspended sentence.

minimum sentence of one year for the offense in question does not present such a case.

2. The defendant further challenges § 10 (*a*) as constituting a violation of the due process clause of the Fourteenth Amendment and parallel provisions of our State Constitution, arts. 1, 10 and 12 of the Declaration of Rights. Under this heading, the defendant sets forth two contentions — (a) that the imposition of a mandatory sentence for a crime that requires no proof of scienter offends the due process clause, and (b) that the § 10 (*a*) sentencing provisions, under either the "strict scrutiny" or "rational relation" test, lack sufficient justification to comply with due process. We examine these arguments seriatim.

(a) We note initially that a strict liability offense does not necessarily constitute a denial of due process. *Commonwealth* v. *Moore*, 359 Mass. 509, 515 (1971). It is well settled that ". . . the Legislature may determine what shall be deemed a 'public welfare offense' punishable notwithstanding innocent intent. . . ." *Commonwealth* v. *Buckley*, 354 Mass. 508, 510 (1968), quoting from *Commonwealth* v. *Murphy*, 342 Mass. 393, 397 (1961). Nonetheless, mindful of the constitutional limitations imposed by *Lambert* v. *California*, 355 U.S. 225 (1957), and the need to avoid possible constitutional doubts, see *Commonwealth* v. *Buckley*, *supra* at 512, we interpret § 10 (*a*) as requiring, as a necessary element of the offense, proof that the accused knew that he was carrying a firearm. As we said in *Commonwealth* v. *Boone*, 356 Mass. 85, 87 (1969), when interpreting G. L. c. 269, § 10, the predecessor to § 10 (*a*), "We would not feel justified in ruling that knowledge is not necessary where the penalty is so severe." See generally *Commonwealth* v. *Crosscup*, *ante*, 228, 234-236 (1975). Although we require proof of knowledge, the trial judge could infer from the facts in this case that the defendant did know that he was carrying a firearm, and, thus the judgment below need not be disturbed.

Having determined that a defendant must knowingly possess the firearm, we do not find that this statute offends the due process clause by imposing a mandatory one-year sentence despite the absence of knowledge as to the existence of a license. In *United States* v. *Freed,* 401 U.S. 601 (1971), the Supreme Court upheld a statute that made it "unlawful for any person 'to receive or possess a firearm which is not registered to him,'" *id.* at 607, and that carried a penalty of not more than $10,000 or imprisonment for not more than ten years. 26 U.S.C. § 5871 (1970). As stated by the Court, "This is a regulatory measure in the interest of the public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act." 401 U.S. at 609. We believe that this reasoning is applicable to the case before us, despite the mandatory sentence imposed by § 10 (*a*), and, thus, we find no constitutional guaranty infringed.[7]

(b) Turning to the defendant's second argument, we conclude, contrary to his contention that fundamental interests are at stake which in turn involve the "compelling State interest" test, that the requisite standard of judicial review is the traditional "rational relation" test. Following such an analysis, we find that the defendant has failed to demonstrate that the statute is without a reasonable basis.

The defendant argues at length that § 10 (*a*) impairs fundamental constitutional rights so that the Commonwealth must establish that its sentencing provisions further a compelling State interest and do so by the least restrictive means. As discussed in the following section, see

---

[7] We need not at this time address the constitutionality of G. L. c. 278, § 7, which places the burden on the defendant to prove that he was licensed to carry a pistol. See *Commonwealth* v. *Davis,* 359 Mass. 758 (1971), where we upheld the procedure established by c. 278, § 7, and *Commonwealth* v. *Pauley,* 368 Mass. 286, 299-300 n.17 (1975). This issue, as the defendant concedes, is foreclosed by the statement of agreed facts.

920-925 *infra,* we find no violation of the separation of powers doctrine, and, therefore, we cannot agree that this statute, by curtailing traditional functions of the judiciary and the executive, impinges on a fundamental right. Cf. *Pinnick* v. *Cleary,* 360 Mass. 1, 12-13 (1971). Nor do we find any merit in the novel argument that a severe penalty for a public welfare or strict liability offense requires the rigorous form of due process analysis. Cf. *Commonwealth* v. *Moore,* 359 Mass. 509, 515 (1971); *United States* v. *Freed, supra.* Those interests which are considered fundamental by this court were enumerated in *Commonwealth* v. *O'Neal,* 367 Mass. 440, 448-449 (1975) (*O'Neal I*). Thereafter, in *O'Neal II, ante,* 242 (1975), although subjecting the mandatory death penalty prescribed by G. L. c. 265, § 2, to strict scrutiny, the court was careful to differentiate capital punishment from all other punishments because of the absolute and irreversible deprivation involved. *Id.* at 246 n.2. There is no doubt that a penalty such as that provided by § 10 (*a*) does not demand and will not be given exacting scrutiny. See *id.* at 246 n.2.

Accordingly, our standard of review in considering the mandatory minimum one-year sentence is whether the statute bears a reasonable relation to a permissible legislative objective. *Pinnick* v. *Cleary, supra* at 14. *Merit Oil Co.* v. *Director of the Div. on the Necessaries of Life,* 319 Mass. 301, 306 (1946). In the application of this test, the statute is accorded a presumption of constitutionality, *Commonwealth* v. *Finnigan,* 326 Mass. 378, 379 (1950); *Merit Oil Co.* v. *Director of the Div. on the Necessaries of Life, supra* at 305, and the burden of overcoming this presumption is not sustained by generalities whether of law or fact. *Massachusetts Comm'n Against Discrimination* v. *Colangelo,* 344 Mass. 387, 391 (1962). "Unless the act of the Legislature cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it, the court has no power to strike it down as violative of the Constitution." *Sperry & Hut-*

*chinson Co.* v. *Director of the Div. on the Necessaries of Life,* 307 Mass. 408, 418 (1940). "Enforcement is to be refused only when it is in manifest excess of legislative power." *Commonwealth* v. *Finnigan, supra* at 379. See generally *Mobil Oil Corp.* v. *Attorney Gen.,* 361 Mass. 401 (1972).

Applying these standards, we must conclude that § 10 (*a*) is a valid exercise of the Legislature's authority. As noted earlier, the Legislature has wide discretion in prescribing penalties and defining crimes. *Commonwealth* v. *Leis,* 355 Mass. 189, 198 (1969). The Constitution does not require the Legislature "'to fix or impose any particular penalty for any crime . . . or to impose the same or "proportionate" sentences for separate and independent crimes.'" *Williams* v. *Oklahoma,* 358 U.S. 576, 586 (1959), quoted in *Commonwealth* v. *Leis, supra* at 199. Within this discretionary range, the Legislature could conclude, as amply demonstrated by our prior Eighth Amendment discussion, that harsh, inflexible penalties are needed to serve as a deterrent and that the need for deterrence, in light of the potential danger created by the unlawful carrying of a firearm, should be the primary, if not the sole, objective of the statute. It is for the Legislature to determine "that society can best be protected against the evil aimed at by a rigorous application of an inflexible rule." *Commonwealth* v. *Mixer,* 207 Mass. 141, 146 (1910). Although we acknowledge the serious debate as to the effectiveness of mandatory sentences,[8] it is not our function to inquire as to "the expediency, wisdom or necessity of the legislative judgment . . . ." *Slome* v. *Chief of Police of Fitchburg,* 304

[8] See, e.g., J.Q. Wilson, Thinking About Crime (1975); A.B.A. Project on Standards for Criminal Justice, Standards Relating to Sentencing Alternatives and Procedures, Approved Draft (1968) § 3.2. (a), at 142; Council of Judges of the National Council on Crime and Delinquency, Model Sentencing Act (2d ed. 1972), comment on § 13; Dershowitz, Let the Punishment Fit the Crime, N.Y. Times, Dec. 28, 1975 (Magazine), at 7.

Mass. 187, 189 (1939). It is not the court's prerogative "to launch an inquiry to resolve a debate which has already been settled in the legislative forum." *Commonwealth* v. *Leis, supra* at 202 (Kirk, J., concurring). Accordingly, in the absence of factual data showing that § 10 (*a*) does not serve the objectives for which it was designed, we find that the defendant has failed to sustain his burden of demonstrating that this statute lacks a rational basis.

3. We now turn to the defendant's argument that § 10 (*a*), by imposing a mandatory minimum sentence, infringes on judicial discretion in violation of the separation of powers doctrine embodied in art. 30 of the Declaration of Rights.[9] It would appear that the defendant contends that the judiciary has the inherent power to defer imposition of sentence by means of probation, a continuance without a finding, or the filing of a case, and that § 10 (*a*), by abrogating these fundamental judicial powers, therefore exceeds legislative authority under art. 30. The defendant distinguishes the means used to defer or suspend the imposition of sentence from that used to suspend the execution of sentence (see G. L. c. 279, §§ 1, 1A), and apparently argues that, while the Legislature may be able to limit a court's ability to suspend a sentence, it has no power to regulate judicial authority to make an appropriate disposition prior to the imposition of sentence. We do not agree.

We note initially that it is not necessary for us to determine whether probation and similar techniques to defer imposition of sentence existed at common law, for we are not confronted with the question whether these powers

---

[9] Article 30 of the Declaration of Rights reads as follows: "In the government of this Commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."

can be exercised in the absence of a statute. Rather, we assume without deciding that these powers are of common law and not of statutory origin. Thus, we limit our inquiry to whether the authority to defer imposition of sentence is so fundamental to the existence of the judicial department as to be considered an inherent power that cannot be restricted or abolished by the General Court without violating art. 30. If, on the other hand, the power to suspend the imposition of sentence is not an inherent power, it is clear that under pt. 2, c. 6, art. 6, of the Massachusetts Constitution, the Legislature has the authority to abrogate or modify common law practices and may therefore limit this power by statute. See *Pinnick* v. *Cleary,* 360 Mass. 1, 11-12 (1971); *Wales* v. *Belcher,* 3 Pick. 508, 510 (1826).

Although the separation of powers doctrine is fundamental to our form of government, and it must be maintained to its full extent, "the exact line between judicial and executive or legislative powers has never been delineated with absolute precision." *LaChapelle* v. *United Shoe Mach. Corp.* 318 Mass. 166, 170 (1945). Nevertheless, there are several areas in which this court has recognized the existence of inherent judicial power and from these examples we are able to discern the parameters of that concept. Among those powers that have been held to be inherent is the power to grant a change of venue in order to secure an impartial trial (*Crocker* v. *Superior Court,* 208 Mass. 162 [1911]), to use contempt proceedings to ensure the orderly administration of justice (*Opinion of the Justices,* 314 Mass. 767 [1943]), to order the county to pay for adequate resources to ensure the proper operation of the courts (*O'Coin's, Inc.* v. *Treasurer of the County of Worcester,* 362 Mass. 507 [1972]), and to make rules governing the internal organization of the courts and to control the practice of law (*Collins* v. *Godfrey,* 324 Mass. 574 [1949]; *LaChapelle* v. *United Shoe Mach. Corp., supra, Opinion of the Justices,* 279 Mass. 607 [1932]). These powers, although they may

be recognized by statute, are inherent and exist without a statute, for they "directly affect the capacity of the judicial department to function." *Opinion of the Justices, supra* at 613. An inherent power is one "essential to the performance of their [the courts'] functions, to the maintenance of their authority, and to their capacity to determine the rights of parties according to law. This power cannot be dispensed with in a court because it is necessary to the execution of all its other powers." *Blankenburg* v. *Commonwealth*, 260 Mass. 369, 373 (1927). See *Crocker* v. *Superior Court, supra* at 179. While it may have been that judges at early common law, in response to an excessively harsh criminal justice system, cf. *Ex parte United States, petitioner*, 242 U.S. 27, 44 (1916), developed means to avoid its rigidity, we cannot say that these practices have attained a constitutional status. The ability to defer the imposition of sentence, although a valuable feature in our legal system, is not necessary to the very existence of a court, and, as such, is not an inherent power beyond statutory limitation.

The logic of this position is demonstrated by considering that in our tripartite system of government it is unquestionable that the Legislature has the authority to determine what conduct shall be punishable and to prescribe penalties. *Sheehan, petitioner*, 254 Mass. 342, 345 (1926). Although it is the court's function to impose sentences upon conviction, it is for the Legislature to establish criminal sanctions and, as one of its options, it may prescribe a mandatory minimum term of imprisonment. *Bel* v. *Chernoff*, 390 F. Supp. 1256, 1259 (D. Mass. 1975). If we were to conclude that the judiciary could exercise its discretion to suspend imposition or execution of sentence despite statutory proscription, a serious question concerning the separation of powers would arise, for, taking this proposition to its logical extreme, it would mean that the judiciary impliedly possesses the power to nullify the Legislature's authority. As recognized by the Supreme Court in *Ex parte United States, petitioner*,

*supra* at 42, "if it be that the plain legislative command fixing a specific punishment for crime is subject to be permanently set aside by an implied judicial power upon considerations extraneous to the legality of the conviction, it would seem necessarily to follow that there could be likewise implied a discretionary authority to permanently refuse to try a criminal charge because of the conclusion that a particular act made criminal by law ought not to be treated as criminal. And thus it would come to pass that the possession by the judicial department of power to permanently refuse to enforce a law would result in the destruction of the conceded powers of the other departments and hence leave no law to be enforced." Cited in part in *Commonwealth* v. *Brandano*, 359 Mass. 332, 336 (1971).

We note that the defendant cites no case in this jurisdiction to support the proposition that the Legislature cannot limit a court's probationary powers, but only cites authorities to indicate that this power existed at common law. While this issue never has been addressed directly by this court, we believe that prior cases implicitly recognize that the power to suspend imposition of sentence is not an inherent power. For instance, in *Finer* v. *Commonwealth*, 250 Mass. 493, 496 (1925), the court stated that "[t]he establishment of the probation system and the limitations upon its exercise are set forth in the statutes. The bounds imposed by the statute must be observed when the machinery provided by the probation system is invoked." Cf. *Commonwealth* v. *Sawicki, ante,* 377 (1975). We also note that the Legislature has limited without challenge the court's discretion to defer imposition of sentence for many years. See, e.g., Carter, Some Aspects of Massachusetts Probation Law and Practice, 42 B.U.L. Rev. 32, 38 (1962), and G. L. c. 276, § 87; c. 265, § 13C; and c. 266, § 14.

Although we recognize that other jurisdictions have indicated that probation is an inherent power, see *State* v. *Wright,* 202 N.W.2d 72, 82 (Iowa 1972) (dissenting

opinion), and cases cited therein, we believe that this is contrary to the preferable approach that has been adopted by a growing majority of States. See, e.g., *Pete* v. *State*, 379 P.2d 625 (Alaska 1963); *Smith* v. *State*, 37 Ariz. 262 (1930); *State* v. *Wright, supra*; *State* v. *Farmer*, 324 A.2d 739 (Me. 1974); *State* v. *Eighth Judicial Dist. Court*, 85 Nev. 485 (1969); *Rightnour* v. *Gladden*, 219 Ore. 342 (1959); *State ex rel. Woodhouse* v. *Dore*, 69 Wash. 2d 64 (1966); *Hicklin* v. *State*, 535 P.2d 743 (Wyo. 1975). In addition, only one case, *State* v. *McCoy*, 94 Idaho 236 (1971), that invalidates a mandatory sentence on the basis of the separation of powers doctrine has been brought to our attention. This case has been the subject of criticism, see McMeen, The Constitutional Power of Idaho Courts to Suspend Sentence: The Uncertain Meaning of *State of Idaho* v. *McCoy*, 11 Idaho L. Rev. 29 (1974); comment, The Constitutionality of Mandatory Sentence Statutes, 29 Wash. & Lee L. Rev. 164 (1972), and is contrary to the law of other jurisdictions. See, e.g., *State* v. *Normand*, 285 So. 2d 210 (La. 1973); *State* v. *Farmer, supra*; *State ex rel. Sonner* v. *Shearin*, 272 Md. 502 (1974); *Black* v. *State*, 509 P.2d 941 (Okla. Crim. 1973); *State* v. *Butterfield*, 12 Wash. App. 745 (1974). It is also well settled at the Federal level that suspension of sentence and probation are not inherent powers, *Affronti* v. *United States*, 350 U.S. 79 (1955); *Ex parte United States, petitioner*, 242 U.S. 27 (1916), and therefore that a mandatory sentence does not encroach upon judicial authority. See, e.g., *Gallego* v. *United States*, 276 F.2d 914 (9th Cir. 1960); *Lathem* v. *United States*, 259 F.2d 393 (5th Cir. 1958); *United States ex rel. England* v. *Anderson*, 347 F. Supp. 115 (D. Del. 1972); *United States* v. *Lewis*, 300 F. Supp. 1171 (E.D. Pa. 1969).

In sum, we affirm the judgment below on the grounds that G. L. c. 269, § 10 (*a*), does not abridge the defendant's rights under either the United States Constitution or the Massachusetts Constitution, since a mandatory one-

year sentence for the carrying of a firearm without a license does not constitute cruel and unusual punishment, deny the defendant due process or equal protection of the laws, see *Commonwealth* v. *McQuoid, post,* 925 (1976), nor does it violate art. 30 of the Massachusetts Declaration of Rights.

*Judgment affirmed.*